IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 1, 2024

**STATE OF TENNESSEE v. JAYLON HATCH**

**Appeal from the Criminal Court for Shelby County**
**Nos. 21-00250, 21-00645   James Jones, Jr., Judge**

_____

**No. W2023-01764-CCA-R3-CD**
_____

The Defendant, Jaylon Hatch, was convicted by a Shelby County Criminal Court jury of attempted premeditated first degree murder, a Class A felony; aggravated assault in concert with two or more persons, a Class B felony; reckless endangerment by discharging a firearm into a habitation, a Class C felony; and employing a firearm during the commission of a dangerous felony, a Class C felony. *See* T.C.A. §§ 39-13-202 (first degree murder), 39-13-102 (Supp. 2019) (subsequently amended) (aggravated assault), 39-13-103 (Supp. 2019) (reckless endangerment), 39-17-1324 (Supp. 2019) (subsequently amended) (employing a firearm). The trial court imposed an effective twenty-one-year sentence. On appeal, the Defendant contends that the evidence is insufficient to establish that he was the perpetrator of the conviction offenses because they are based on the uncorroborated testimony of an accomplice. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Rosalind E. Brown (on appeal); and Jim Hale (at trial), Memphis, Tennessee, for the appellant, Jaylon Hatch.

Jonathan Skrmetti, Attorney General and Reporter; John Cerisano, Assistant Attorney General; Steve Mulroy, District Attorney General; and Forrest M. Edwards and Chris Lareau, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to two drive-by shootings at a Memphis home during which several victims were shot and injured. The Defendant was tried jointly with codefendants Jerrell Anderson and Mitchell Hopkins. Codefendant Jerry Anderson, Jerrell Anderson's brother, testified for the State at the joint trial.

Leslie Kendrix testified that on June 8, 2020, she and her family and friends were at her home celebrating her daughter's birthday when she heard gunshots outside. She said that there were "too many" gunshots to count and that the shooters "shot up the whole house." According to Ms. Kendrix, approximately ten bullets entered the house, many leaving holes in the walls and breaking windows. Her doorbell audio and video camera recorded the incident, and the recording was received as an exhibit and played for the jury. Ms. Kendrix testified that although she was not outside during this first shooting, she saw two or three men shooting guns on the recording.

The doorbell recording showed Ms. Kendrix's house's front porch and the road in front of her house. Her ex-husband and others stood by a car in the driveway and her son's friend stood on the porch. Two cars, one black and the other silver, drove in front of the house and stopped. After someone from one of the cars yelled, several men stepped out of the cars and began shooting toward the house.

Ms. Kendrix testified that, after the 3:08 p.m. shooting, the police conducted a brief investigation and left. Later that day, at 6:40 p.m., people were on her porch, and Ms. Kendrix was sweeping up broken glass and debris. Ms. Kendrix said she left the porch to go inside at which time she heard more gunshots and called 9-1-1. During the second shooting, Ms. Kendrix's mother was shot in the hip, her two-year-old granddaughter was shot in the leg, and her cousin was shot in the leg. The doorbell recording of the second shooting incident was received as an exhibit and played for the jury.

The doorbell recording of the second shooting showed several people leaving Ms. Kendrix's front porch, and Ms. Kendrix's mother sweeping the porch. Multiple gunshots were fired, Ms. Kendrix's mother fell to the ground, and Ms. Kendrix's two-year-old granddaughter ran across the porch to the front door. The recording showed Ms. Kendrix's daughter crying out, "My baby, my baby f------ hit." Ms. Kendrix's cousin, who was armed, indicated that he had been shot, and several people attended to Ms. Kendrix's mother on the porch.

Lola Bolden testified that she was Ms. Kendrix's mother, that she was at Ms. Kendrix's house at the time of both shootings, and that she was age seventy at the time.

Ms. Bolden said that, during the first shooting, bullets entered the room where she and a grandchild were sitting and cracked a front window. She stated that, during the second shooting, she was shot in the leg. This fractured her femur and pierced a vein and arteries, which required surgery and a rod in her leg. She noted that her injuries required her to use a cane to walk.

David Freeman testified that he was present during the two shootings on June 8, 2020. Mr. Freeman said that he was working on his car in the driveway when the first shooting occurred. Two cars appeared in front of the house: a black Mercedes G Wagon and a silver Mercedes sedan. Mr. Freeman said that he ran toward the back of the house when he heard gunshots and that Lakendrick Stewart was shot. According to Mr. Freeman, two men were in each car. Mr. Freeman said he was on the front porch when the second shooting occurred.

Jessie Murrell testified that he received a telephone call on June 8, 2020, in which he learned about the shooting at his cousin's house. Mr. Murrell, who had a handgun license, said he armed himself and went to Ms. Kendrix's house around 5:00 p.m. Once there, he noticed a silver Mercedes sedan parked along the street. He said that, while helping a family member load chairs into a car, he heard gunshots from the corner of the street, where he saw five shooters. Mr. Murrell said that he returned gunfire and was shot twice in the leg. Mr. Murrell stated that he received medical treatment for the gunshots, that he had residual pain from the injuries, and that the bullets remained in his leg. On cross-examination, Mr. Murrell acknowledged that he could not identify the shooters.

Alexis Monger testified that she was Ms. Kendrix's daughter and that she and her two-year-old daughter were at Ms. Kendrix's house during the shootings. According to Ms. Monger, she and her daughter were asleep in a back bedroom at the time of the first shooting, but her daughter was on the front porch at the time of the second shooting, was shot in her left leg, and was grazed by a bullet on her right leg. Ms. Monger said that she drove her daughter to the hospital for medical treatment.

Memphis Police Department (MPD) Officer Henry Hearns testified that he responded to both shootings, photographed the scene, and preserved and collected evidence. Officer Hearns's photographs, sketch of the area, and crime scene report were received as exhibits and shown to the jury. The photographs showed the location of the cartridge casings on the street in front of and beside Ms. Kendrix's house. One photograph showed that eight bullets entered Ms. Kendrix's house through a front porch window. Other photographs showed that a bullet struck Ms. Kendrix's television and that several bullets embedded in interior walls. Officer Hearns said that bullets also pierced a window and struck a bathroom medicine cabinet at the house next door. Officer Hearns said that he collected over ninety cartridge casings that had been fired from four different firearms.

MPD Sergeant Keith Phillips testified that he responded to the first shooting and later retrieved surveillance recordings from a nearby convenience market which showed cars matching the cars identified in the first shooting as they drove away from Ms. Kendrix's neighborhood. According to Sergeant Phillips, immediately before the second shooting, a convenience market recording showed a silver sedan and a black sedan circle the block near Ms. Kendrix's house and stop at a corner where men got out of the cars and began walking toward Ms. Kendrix's home. Sergeant Phillips also obtained Cherry Creek Apartments surveillance recordings from which he identified codefendant Jerry Anderson and his brother, codefendant Jerrell Anderson, as initial suspects. The apartment complex surveillance recordings were received as an exhibit and played for the jury.

A Cherry Creek Apartments surveillance recording, from a camera facing the apartment parking lot, showed that a silver Mercedes sedan, a black sedan, and a black Mercedes G Wagon pulled into the parking lot after the first shooting and that five men, some carrying weapons, walked into the apartment complex. A different surveillance camera showed that the same five men entered an apartment. One of the men wore a white, flat-brimmed baseball hat with the bill turned to the side. Several hours later and before the second shooting, a surveillance camera recorded eight men leaving the apartment, and another camera recorded the men walking to the parking lot, including the man who wore the white baseball hat. Four cars left the parking lot: two silver Mercedes sedans, a black Mercedes G Wagon, and a black sedan.

Sergeant Phillips testified that surveillance recordings from the apartment complex showed that the armed men returned from the first shooting and entered an apartment occupied by someone called "Dome-Shot." Sergeant Phillips identified codefendant Jerry Anderson and codefendant Jerrell Anderson on the recordings, both of whom were arrested on September 9, 2020. Sergeant Phillips said that he talked to Jerry Anderson, that Jerry Anderson identified the Defendant and codefendant Hopkins as additional suspects, and that he did not record his interview with Jerry Anderson. Sergeant Phillips corroborated the Defendant's identity by comparing the Defendant's MPD database photograph with the apartment complex surveillance recording of the men returning from the parking lot after the first shooting.

On September 9, 2020, Sergeant Phillips interviewed codefendant Jerrell Anderson, and a video recording of the interview was received as an exhibit and played for the jury. During the interview, Jerrell Anderson acknowledged that he drove a silver Mercedes sedan to the first shooting, that Darrin Wilson was with him, and that he fired shots at Ms. Kendrix's house. Jerrell Anderson said that a black Mercedes G Wagon followed his car but that he did not know who was in it. Jerrell Anderson stated that he went to Cherry Creek Apartments after the first shooting. He acknowledged that the

apartment complex's surveillance recordings showed him and the other shooters and that the recordings reflected the cars they drove to Ms. Kendrix's house during both shootings. Jerrell Anderson confirmed that he returned to Ms. Kendrix's house in the silver Mercedes sedan for the second shooting, that he was alone in the car, and that he did not fire a weapon. According to Jerrell Anderson, there were three individuals at the first shooting and eight at the second. Jerrell Anderson said that the shooters were targeting "Big Jook." Jerrell Anderson did not know the present location of the guns used during the shootings and concluded his interview by saying, "I didn't shoot that little girl or the grandma."

On cross-examination, Sergeant Phillips testified that codefendant Jerrell Anderson initially said that his brother, codefendant Jerry Anderson, was not involved in the second shooting, but later implicated Jerry Anderson in that shooting. Sergeant Phillips said he corroborated that Jerrell Anderson was present and fired a weapon at the first shooting, that the shooters rode in a silver Mercedes sedan and a black Mercedes G Wagon, and that the shooters returned with their weapons to Dome-Shot's apartment. According to Sergeant Phillips, although the apartment surveillance recording showed that eight individuals left the apartment complex prior to the second shooting, the doorbell recording of the second shooting showed that only three men fired weapons. Sergeant Phillips confirmed that Jerry Anderson and Jerrell Anderson admitted they were at the second shooting and that they provided information regarding others present.

Shelby County District Attorney General's Office technical litigation analyst Rebecca Gross testified that she created a video presentation of the events before and after each shooting by synthesizing the surveillance recordings, 9-1-1 calls, maps of the area, and other evidence. Ms. Gross's video presentation was received as an exhibit and played for the jury. In a video detailing the first shooting, Ms. Gross overlaid photographs of the Defendant and codefendant Hopkins onto the Cherry Creek Apartments surveillance recorded images of the shooters entering the apartment complex from the parking lot. The video presentation showed an interactive map depicting the location of the shooters' cars immediately before and after the shootings. On cross-examination, Ms. Gross acknowledged that she could not confirm the exact route the shooters took from Ms. Kendrix's house to Cherry Creek Apartments after the shootings.

Codefendant Jerry Anderson testified that he was thirty-one years old and that codefendant Jerrell Anderson was his brother. Jerry Anderson said that he had graduated from Arkansas Tech University with a degree in mass communications and that he was a music producer. Jerry Anderson acknowledged that, as a result of his participation in the second shooting, he was charged with attempted first degree murder, aggravated assault, reckless endangerment, and employing a firearm during a dangerous felony. On October 6, 2020, Jerry Anderson and his attorney spoke to Sergeant Phillips regarding Jerry

Anderson's involvement in the shootings. Jerry Anderson admitted that he initially "told many lies" but confirmed that he was one of the shooters at the second shooting.

Codefendant Jerry Anderson testified that although he was not present for the first shooting, his brother telephoned that day saying he had been in a "shootout" and "slid on somebody," meaning his brother was involved in a drive-by shooting. Jerry Anderson said that, immediately after talking to his brother about the first shooting, he met his brother and the men from the first shooting at the Cherry Creek Apartments parking lot. Watching the surveillance recording of the Cherry Creek Apartments parking lot, Jerry Anderson identified his black sedan and his brother's silver Mercedes sedan pulling into the parking lot after the first shooting. On that recording, Jerry Anderson identified himself, his brother, codefendant Hopkins, Mr. Wilson, and the Defendant, who wore a white, flat-brimmed baseball hat with the bill turned to the side. Jerry Anderson said that either Mr. Wilson or the Defendant was in his brother's car during the first shooting. Jerry Anderson also identified the Defendant in a Facebook photograph in which the Defendant wore a similar flat-brimmed baseball hat with the bill turned to the side. Jerry Anderson said that he met the Defendant for the first time on the day of the shootings.

Codefendant Jerry Anderson testified that, after the first shooting, he entered Dome-Shot's apartment with four other men, including the Defendant, and met other men there. According to Jerry Anderson, several men were engaged in firearm maintenance and were smoking "weed." Jerry Anderson said that he did not know why his brother wanted to go back to Ms. Kendrix's house and noted that the Defendant "got his gun ready" and said, "I want to go back [to Ms. Kendrix's house]" and "B----, I'm ready to go." Jerry Anderson confirmed that only the black Mercedes sedan and the silver Mercedes sedan returned for the second shooting. Jerry Anderson said that he assumed the Defendant rode with his brother because he saw the Defendant standing beside his brother's car before they left to commit the second shooting. Jerry Anderson said he saw several armed men standing in front of Ms. Kendrix's house, that he and his brother parked their cars at the corner of the block, and that "everyone" got out of the cars and began shooting toward Ms. Kendrix's house.

Codefendant Jerry Anderson testified that he initially told police officers that he had not driven to the second shooting, that he had not fired a weapon, and that he had not known any of the other shooters. Jerry Anderson, however, identified himself, Mr. Wilson, and codefendants Jerrell Anderson and Hopkins on the doorbell camera recording of the second shooting. According to Jerry Anderson, the recording did not show the Defendant because he stood on a different corner. Jerry Anderson said the Defendant and codefendant Hopkins had assault rifles. Jerry Anderson stated that he, Mr. Wilson, the Defendant, and codefendants Jerrell Anderson and Hopkins returned briefly to Dome-Shot's apartment after the second shooting. Jerry Anderson confirmed that he

saw the Defendant "a couple of times" after the shootings but that they did not discuss the shootings.

On cross-examination, codefendant Jerry Anderson testified that he initially lied to Sergeant Phillips about not knowing who was involved in the shootings and that he was certain that the Defendant fired a weapon during the second shooting. Jerry Anderson confirmed that the shootings regarded drug money owed to his brother and that no one planned to kill anyone. Jerry Anderson reiterated that the prosecutor did not promise to grant him leniency and acknowledged that he had provided the names of the shooters that the State might not have had otherwise. Jerry Anderson reiterated that, while at Dome-Shot's apartment before the second shooting, the Defendant said that his gun had "jammed" during the first shooting. Jerry Anderson also acknowledged that his testimony was necessary to convict the Defendant and codefendant Hopkins.

The defense elected not to offer any proof.

Upon this evidence, the jury convicted the Defendant of attempted first degree premeditated murder, aggravated assault, reckless endangerment, and employing a firearm during a dangerous felony, and he received an effective twenty-one-year sentence. This appeal followed.

**Analysis**

The Defendant contends that the evidence is insufficient to identify him as a participant in the first shooting because codefendant Jerry Anderson's identification was not corroborated by other proof and was not reliable. The State counters that the evidence is sufficient to corroborate the Defendant's identification and participation in the first shooting and that the jury properly weighed Jerry Anderson's credibility. We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2011) (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

> A person is criminally responsible for an offense committed by the conduct of another, if:
>
> . . .
>
> (2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402(2) (2018). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

The record reflects that codefendant Jerry Anderson was an accomplice to the second shooting. Our supreme court recently abolished the common law requirement for corroborative testimony of accomplices but did so on a prospective basis. *State v. Thomas*, 687 S.W.3d 223, 242-43 (Tenn. 2024). At the time the *Thomas* opinion was decided, this appeal was pending. Accordingly, in this case, we apply the common law rule that requires that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." *See, e.g.*, *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964), *overruled on other grounds by State v. Collier*, 411 S.W.3d 886 (Tenn. 2013). In order for accomplice testimony to be adequately corroborated:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also

include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bigbee*, 885 S.W.2d at 803 (quoting *State v. Gaylor*, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992) (citations omitted)); *see Shaw*, 37 S.W.3d at 903.

Although the Defendant stated in his brief that the issue for review is "whether the trial court erred in denying [his] motion for a new trial as the jury verdict was against the weight of the evidence[,]" he only provided argument regarding whether accomplice testimony identifying the Defendant was corroborated by other evidence. We will direct our analysis accordingly. *See* T.R.A.P. 27(a)(7), Tenn. R. Ct. Crim. App. 10(b). Further, an appellate challenge to the weight of the evidence is properly addressed by a sufficiency of the evidence analysis. *See State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993) (stating that after a trial court has discharged its obligation as thirteenth juror and approved the verdict, an appellate court must credit the testimony of the State's witnesses and resolve evidentiary conflicts in the State's favor).

Viewed in the light most favorable to the State, the record reflects the Defendant participated in the first shooting. Mr. Freeman and codefendant Jerrell Anderson identified the cars driven to the first shooting as a silver Mercedes sedan and a black Mercedes G Wagon. The convenience store recording showed a silver Mercedes sedan and a black Mercedes G Wagon leaving Ms. Kendrix's neighborhood after the first shooting. Surveillance recordings from Cherry Creek Apartments showed a silver Mercedes sedan and a black Mercedes G Wagon returning to the apartment complex after the first shooting. The apartment surveillance recordings also showed five men, some visibly carrying guns, returning to the apartment complex after the first shooting and entering Dome-Shot's apartment. Sergeant Phillips identified Jerrell Anderson and codefendant Jerry Anderson in those recordings. Sergeant Phillips also compared the images of the men on the apartment recording with the Defendant's photograph from the MPD database and confirmed that the Defendant was one of the men shown on the recording entering the apartment complex from the parking lot after the first shooting.

Codefendant Jerry Anderson testified that he was not present for the first shooting but met the other men in the apartment parking lot after the first shooting and that he walked to Dome-Shot's apartment with them. From the Cherry Creek Apartment surveillance recordings after the first shooting, Jerry Anderson identified the Defendant as the man who wore a white, flat-brimmed baseball hat with the bill turned sideways and

said that the Defendant was one of the men at Dome-Shot's apartment. According to Jerry Anderson, while at Dome-Shot's apartment after the first shooting, the Defendant said, "I want to go back [to Ms. Kendrix's house]" and "B----, I'm ready to go." The jury was shown the Cherry Creek Apartments recordings and the Defendant's Facebook profile photograph, which showed the Defendant wearing a flat-brimmed baseball hat with the bill turned sideways.

"Only slight circumstances are required to corroborate an accomplice's testimony" as the evidence need only "tend[] to connect the defendant with the commission of the crime charged." *State v. Fusco*, 404 S.W.3d 504, 525 (Tenn. Crim. App. 2012) (citation omitted); *Bigbee*, 885 S.W.2d at 803; *see State v. Lacorious Tyquez Fuller*, No. M2023-00694-CCA-R3-CD, 2024 WL 4235619, at *7 (Tenn. Crim. App. Sept. 19, 2024) (officers' identification of the defendant from a video recording corroborated the accomplices' identification of the defendant) (*perm. app. filed* Nov. 18, 2024). In the present case, the trial court determined that codefendant Jerry Anderson was an accomplice and instructed the jury that his testimony must be corroborated by independent evidence. The jury had the opportunity to compare the Defendant's appearance at the trial with the recordings from Cherry Creek Apartments and to hear Sergeant Phillips's testimony. Sergeant Phillips testified that he corroborated the Defendant's identity by comparing the Defendant's MPD photograph with the Cherry Creek Apartments' recording of the shooters returning to the apartments after the first shooting. The evidence in this case is sufficient to corroborate Jerry Anderson's identification of the Defendant.

The Defendant also argues that inconsistencies in codefendant Jerry Anderson's statements to law enforcement "raised serious questions about his credibility" at the trial. However, the jury had the opportunity to weigh his credibility after hearing his testimony and defense counsel's cross-examination of him. This court does not reweigh evidence and questions regarding the credibility of witnesses and the weight to be given the evidence are resolved by the trier of fact. *See Bland,* 958 S.W.2d at 659.

We conclude that the evidence is sufficient to support the Defendant's convictions. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-10-